William F. Pohlen and Katherine Pohlen v. Commissioner.
Pohlen v. Commissioner
Docket No. 6878.
United States Tax Court
1947 Tax Ct. Memo LEXIS 287; 6 T.C.M. (CCH) 226; T.C.M. (RIA) 47056; February 28, 1947
Muckleroy McDonnold, Esq., 503 Nat. Bank of Commerce Bldg., San Antonio, Tex., for the petitioners. Donald P. Chehock, Esq., for the respondent. TURNER Memorandum Opinion TURNER, Judge: This proceeding involves an income tax deficiency for 1939 of $231.13 and a fraud penalty of $122.09. The questions in issue are the amounts of taxable income which the petitioners received from conducting several soliciting campaigns for charities and from the sale of equipment used in conducting the campaigns. The deficiencies are barred by the statute of limitations, section 275, Internal Revenue Code, unless the return for the taxable year 1939 was false and fraudulent, or unless there was omitted from gross income properly includible in the return an amount in excess of 25 per cent of the amount *288 of income stated in the return. Section 275 (c), Internal Revenue Code. This is a companion case to William F. Pohlen v. Commissioner and Katherine Pohlen v. Commissioner, Docket Nos. 6879 and 6880 [6 TCM 229,], involving the petitioner's tax liability for 1942 and 1943 and negligence penalties for those years. The petitioners are husband and wife, residing in San Antonio, Texas. They filed a joint income tax return for 1939 with the Collector for the First District of Texas on March 8, 1940. The transactions dealt with herein being those of William F. Pohlen, he will be referred to as the petitioner. During the taxable year 1939 and for several prior years the petitioner was engaged in the business of soliciting funds by mail for various Catholic charities. He would furnish the necessary equipment, supplies, labor and mailing lists at his own expense and would receive as his compensation either a salary or a percentage of the contributions received, plus a small amount for each letter mailed out. He usually operated under contracts with members of the clergy of the Catholic church. From some time in 1934 until the latter part of 1937 the *289 petitioner conducted a campaign in the name of "Mexican Priests and Sisters Aid" under a contract with Archbishop Ruiz of Mexico, who was at that time living in the United States. Under that contract the petitioner received a stipulated percentage of the gross contributions as his compensation. On February 18, 1938, the petitioner and his nephew, R. S. Pohlen, entered into a contract with Bishop Ledvina of Corpus Christi, Texas, to conduct a campaign in the name of "Mexican Aid." The Reverend Balzola of Brownsville, Texas, was appointed to assist in the campaign. The contributions were all deposited in the San Benito Bank and Trust Company to the account of "Mexican Priests and Sisters Aid." As their compensation the petitioner and his nephew received 1 1/2 cents, plus postage, for each outgoing letter and 20 per cent of the gross receipts, after the deduction of "Mass stipends." The petitioner and his nephew shared equally in the income from this contract. The contract terminated in the latter part of 1938 but contributions from letters already sent out continued to come in for sometime thereafter. Contributions totaling $4,414.67 were received during 1939 and were deposited *290 in the same bank account at the San Benito Bank and Trust Company. The petitioner considered that these funds did not belong to the Mexican Aid, since the contracts under which the campaigns had been conducted had terminated, but he made no claim to them on behalf of himself or his nephew. He wrote to his brother, J. J. Pohlen, a Catholic priest at Sisseton, South Dakota, for advice as to what disposition should be made of the funds. His brother suggested that the petitioner send the money to him and that he would say masses for all of the contributors. The petitioner sent some of it to him but the evidence does not show just what amount. On inquiry from an internal revenue agent the Reverend J. J. Pohlen stated that he received $1,784 from the petitioner in 1939. In the joint return for 1939 the petitioner reported, under Schedule D, $3,531.12 as the gross amount received from such contributions, which he listed as "Mail Solicitation." Showing $2,132 as "Distribution to Rev. F. Balzola" and $123 as paid out for stamps for sending acknowledgment notes to the contributors, he reported on page 1, line 9 of the return $1,276.12 as the amount of taxable income "From Business or Profession. *291 " The Reverend Balzola stated to the examining revenue agent that payments aggregating $1,100 were made to him by the petitioner in 1938 and 1939 but he did not say, and it is not otherwise shown, how much, if any, of that amount he received in 1939. The respondent allowed the petitioner a deduction of the whole amount of $1,100 in 1938 because of the fact that there was a difference of exactly $1,100 between the amount shown on the petitioner's records as distributed to the Reverend Balzola in 1938 and the amount of such distribution reported in the petitioner's return for that year. For the taxable year 1939 the respondent allowed the deduction of $1,784 as the amount "Disbursed to J. J. Pohlen, Sisseton, S.D. for masses" and also allowed the $123 claimed for postage, leaving taxable income of $2,507.67. After the Mexican Aid campaign was completed the petitioner and R. S. Pohlen in November 1938, entered into a contract with the Reverend Schulte to conduct a campaign to raise funds to purchase airplanes for the use of Catholic priests on missions. The campaign was to be conducted from Washington, D.C. The petitioner moved all of his office equipment and supplies from Brownsville, *292 Texas, to Washington by truck. The equipment consisted of mailing lists of about one million names, a multigraph machine, folding machine, desks, several typewriters, and other items. Some additional equipment was purchased in Washington, including fifty-five thousand name plates and frames, two machines for embossing the name plates, and an automatic addressograph. Under the Schulte contract the petitioner and his nephew were to receive 2 1/4 or 2 1/2 cents for each letter mailed out and a salary of $250 per month each. They conducted the campaign according to their contract until about August 1, 1939, when because of ill health the petitioner sold his half interest in the contract and the business, including all of the equipment, to the Reverend Paul Schulte for $5,000, which he received in cash in 1939. The campaign was continued by R. S. Pohlen and the Reverend Schulte. In his return for 1939 the petitioner reported gross income from the Schulte campaign of $1,750. His nephew, R. S. Pohlen, in his return for 1939 reported gross income of $4,526 from the Schulte campaign. The respondent determined that the petitioner's income from that source amounted to $2,640.19. That amount *293 is seven-twelfths of the $4,526 which R. S. Pohlen reported as his income. Since he and the petitioner were entitled to share equally in the profits and since the petitioner was engaged in the business only seven months of 1939, the respondent concluded that the petitioner's income must have been seven-twelfths of that of his nephew. The petitioner did not report the sale of his interest in the business to the Reverend Schulte in his return for 1939. The respondent determined that the petitioner realized a gain on the sale of $2,595.46. He allowed the petitioner a cost basis of $299.54 for the machinery and equipment brought to Washington from Texas and $2,175 cost basis for that purchased in Washington. The $2,175 was one-half of the total amount ($4,350) which the petitioner represented to an internal revenue agent as being the amount which he and his nephew had paid jointly for such machinery and equipment. Altogether, the petitioner reported in his return for the taxable year 1930 the $1,276.12 received from the Mexican Aid campaign referred to above, $1,750 from the Schulte campaign, dividends of $850, and a net shortterm capital gain from sales of stock of $136.52, making *294 a total income of $4,012.64. There was an interest deduction of $428.04, leaving a net income of $3,583.60 and a tax due of $13.05. The respondent's computation resulted in an adjusted net income of $8,102.32 and a deficiency of $231.13, to which he has added the fraud penalty of $122.09. At the petitioner's request his return for 1939 was prepared by his nephew in Washington, D.C., while petitioner was visiting his brother at Sisseton, South Dakota. The petitioner had gone to South Dakota after selling out his interest in the Schulte contract about August 1, 1939. While visiting his brother he received medical treatment, from time to time, in the hospital which his brother operated. His return was forwarded to him at Sisseton. He signed the return and forwarded it to Brownsville, Texas, for his wife's signature. The deficiency notice was mailed to the petitioners on November 18, 1944, and the petitioner herein was filed January 5, 1945. With respect to the fraud issue the burden of proof rests upon the respondent. Section 1112, Internal Revenue Code. The evidence, we think, fails to show fraud. There can be no doubt that the petitioners were grossly negligent *295 in the preparation of their return and we would not hesitate to sustain the respondent if he had asserted the negligence penalty under section 293 (a) as he did in the companion cases, Docket Nos. 6879 and 6880. However, convincing evidence of an intent on the petitioners' part to evade tax by filing a false or fraudulent return is lacking. From the Mexican Aid campaign, petitioner reported income for 1939 to $1,276.12 while respondent determined that his income from that source was $2,507.67. The contributions were received after termination of the contracts under which the campaigns had been conducted. There were two of these contracts, one with Archbishop Ruiz, which expired in 1937, and one with Bishop Ledvina, which was terminated in the latter part of 1938. Under both of these contracts the petitioner was entitled to a certain percentage of the contributions as his compensation. The amount was 20 per cent under the Bishop Ledvina contract. It is not necessary for us to determine, nor could we determine on the evidence before us, to whom the funds properly belonged or whether the petitioner transgressed any laws or violated any trust in handling them. The respondent does not *296 propose to include all of the funds in the petitioner's gross income. The petitioner reported $3,531.12 as the gross amount of the contributions received in 1939, whereas there were total contributions of $4,414.67. In Schedule D of his return petitioner, after excluding $123 for stamps and $2,132 as distributed to Reverend Balzola, reported the balance as his income. The respondent, on the other hand, after allowing for the stamps, excluded $1,784 as paid over to Reverend J. J. Pohlen, and determined the balance of $2,507.67 as income of the petitioner. He allowed nothing as payments to Reverend Balzola, apparently concluding that any amounts so paid were paid in 1938. Petitioner, on the other hand, had made no allowance on the return for the $1,784 paid to the Reverend J. J. Pohlen. Petitioner might with some force argue that no more than $858.33 was his, since under the Ledvina contract he was entitled to 20 per cent of the contributions and $858.33 happens to be 20 per cent of the 1939 contributions after allowing for postage. Petitioner has not shown by any convincing proof, however, that he did not retain as his own any amount less than the amount determined by the respondent. *297 It is accordingly our conclusion that while we find no fraud as to this issue, the evidence affords no basis for upsetting the respondent's determination. As taxable income from the Schulte campaign the petitioner reported $1,750, whereas the respondent has determined that the amount received was $2,640.19. He arrived at that amount by taking seven-twelfths of the gross amount which the petitioner's nephew, R. S. Pohlen, reported in his return as income from the Schulte campaign. The petitioner and his nephew, under the contract, were to receive a salary of $250 per month each, plus 2 1/4 to 2 1/2 cents for each letter mailed out. It should be noted that $1,750 is the exact amount of the petitioner's salary for the seven-months period, January 1 to August 1, 1939. Thus, it appears that the petitioner did not report any of the receipts from the letters mailed out during that period. His nephew, however, reported a total of $4,526, of which $1,526 ($4,526 less salary of $3,000) must have been from the letters mailed out. In the absence of any records upon which he could reply, we think that the respondent was justified in determining that the petitioner, for the seven months during *298 which he was engaged in the business, received seven-twelfths of the amount which R. S. Pohlen reported in his return. We are unwilling to find on this evidence, however, that there was a fraudulent omission of income from the return. The petitioner did not report the sale of his interest in the business to the Reverend Schulte in 1939. He claims that he realized no gain on the sale because the assets sold had a cost basis in excess of the amount received. He could produce no records, or other satisfactory evidence, to sustain this claim. The respondent allowed him a cost basis of $2,175, as explained above, and determined a net profit of $2,595.46. Again, the respondent's determination of the taxable gain must be sustained for lack of evidence of error, but the evidence fails to show fraud. The respondent did not make any allowance in his cost basis for the lists of names which the petitioner claims that he sold along with the other assets of the business. He took the position that the petitioner did not sell the lists or the exclusive use thereof, but retained either the original, or copies, for his own use. In any event, the evidence does not show what the cost basis of the *299 lists was in the petitioner's hands at the time of the sale. The failure of a taxpayer to report a transaction on which he reasonably believes that he has had no taxable gain could hardly be said to make the return false and fraudulent or to show an intent to evade tax. On the evidence before us, we find that the petitioner's return for 1939 was not false or fraudulent. On the other hand, we sustain the respondent's determination of tax liability for lack of evidence of error in his determination. For although as stated above, the respondent has the burden of proof as to the fraud issue, his determination as to the amount of tax due is prima facie correct and the burden of proving it erroneous rests upon the petitioner. See Snell Isle, Inc. v. Commissioner, 90 Fed. (2d) 481. Since the gross income as determined by the respondent, and properly includible in gross income, is more than 25 per cent greater than that reported by the petitioner, the statute of limitations under section 275 (c) has not run against the proposed assessment. Decision will be entered under Rule 50.